IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 21, 2010

## DAMIEN TOLSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lawrence County**
**No. 27077      Robert L. Jones, Judge**

**No. M2009-00724-CCA-R3-PC - Filed July 29, 2010**

The petitioner, Damien[1] Tolson, appeals the denial of his petition for post-conviction relief from his first degree premeditated murder conviction, arguing that the post-conviction court erred in finding that he received effective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

John E. Herbison, Nashville, Tennessee, for the appellant, Damien Tolson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and James G. White, II, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of the first degree premeditated murder of Sherry Pogue and sentenced to life imprisonment. This court affirmed his conviction on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. State v. Damiean Devon Tolson, No. M2005-01085-CCA-R3-CD, 2006 WL 3831234 (Tenn. Crim.

---

[1] We utilize the spelling of the petitioner's name from the original post-conviction petition. However, the amended post-conviction petition and this court's opinion on direct appeal contain the spelling, "Damiean."

App. Dec. 28, 2006), perm. to appeal denied (Tenn. Apr. 16, 2007). Our direct appeal opinion provides the following summary of the evidence presented at the petitioner's trial:

Brian Serrett testified that on July 29, 2003, he and Sherry Pogue, the victim, went to the North End Market in Lawrenceburg, Tennessee, to look for the [petitioner] in hopes of "get[ting] some dope." Serrett did not know the [petitioner] prior to this time, but the [petitioner] and victim had evidently conducted business on previous occasions. As Serrett and the victim pulled into the market, the [petitioner] approached the car and handed the victim several rocks of crack cocaine to which the victim responded that she could "do better than that in Mt. Pleasant." The [petitioner] then got into the backseat of the car and said he needed to go to Mt. Pleasant to "[g]et some more dope." Serrett told the [petitioner] that he was not going to Mt. Pleasant, but he could get the [petitioner] some drugs around the corner.

Serrett testified that the [petitioner] gave him $100 and the [petitioner] and victim got out of the car. Serrett drove around the corner to Shirley and Sidney Richardson's house and asked a Jerry Collier to drive the car back to the market and tell the [petitioner] and victim that Serrett had left. Collier delivered the car and returned to the Richardson house, and soon after the [petitioner] and victim also arrived at the house. While the victim was still in her car, the [petitioner] approached the house inquiring about his money. Serrett stepped out onto the front porch and told the [petitioner] that it would be a minute.

Serrett recalled that Sidney Richardson went outside and started arguing with the [petitioner]. Richardson followed the [petitioner] out into the yard and the [petitioner] picked up a plate and threw it at Richardson. The [petitioner] got into the car with the victim and they drove away. Shirley Richardson took Serrett home and Serrett still had the [petitioner's] money.

Geraldine Hicks testified that she was working at the North End Market on July 29, 2003. Hicks noticed that the victim came into the market around 8:30 p.m. and stood around for about ten minutes acting like she was waiting on someone. The victim paced around outside the market and eventually got into a car and left. Hicks remembered that the [petitioner] was in the market at the same time as the victim, but she did not know if they had arrived together. Hicks stated that the market's policy was to close as close to 9:00 p.m. as possible.

Ronda Cathy testified that she was also working at the North End Market on July 29, 2003. Cathy saw the victim and the [petitioner] in the market at the same time around 8:30 p.m., but the [petitioner] left before the victim. The victim left the store about ten minutes after the [petitioner] and got into the passenger seat of her car. The [petitioner] was wearing a gray sweatshirt and blue jeans that night, which was not unusual for the [petitioner] even though it was July.

Sidney Richardson, also known as Amber Brant,[2] testified that the victim was her cousin and on July 29, 2003, she saw the victim at the North End Market around 8:15 p.m. waiting for someone to return in her car to pick her up. Brant returned to her house and Serrett showed up about 8:30. After Serrett had been at her house for five minutes, the [petitioner] showed up and asked Serrett about his money. The [petitioner] left, then returned a few minutes later, and talked to Serrett around the side of the house. Apparently, the [petitioner] wanted his money back and Serrett would not give it to him. Brant recalled that the [petitioner] was mad and upset.

Brant testified that the [petitioner] left again and came back a few minutes later with the victim in the victim's car. Brant recalled that Serrett had run out the back door of the house, and she approached the [petitioner] and told him not to come back. The [petitioner] told Brant that Serrett had told him that Brant and the victim had his money. The [petitioner] said that "I bet I get my money, or I'll mess somebody up." The [petitioner] and victim left the house between 8:45 and 9:00 p.m.

Brant testified that the [petitioner] returned to her house around 9:15 p.m. in another car driven by one of the [petitioner's] female relatives. The [petitioner] told Brant that "he'd messed [her] cousin up, and to bring [her] butt out there and see if he don't pop [her]." Brant approached the [petitioner] and the [petitioner] reached in the car, got a plate, hit her on the side of the ear, and left.

On cross-examination, Brant admitted that she did not give a statement to police until nine days after the shooting because she was afraid if she talked to the police she would be arrested on outstanding probation violation warrants. Brant said that the [petitioner] was wearing a white shirt and dark

_____

[2] Apparently, Sidney Richardson was born a male, but changed his sex and now goes by Amber Brant. Hereinafter, we will refer to Sidney Richardson as "Brant" or "Amber Brant."

pants every time she saw him that night, except the time he pulled up and hit her with the plate when he was wearing darker clothes. Brant recalled that Serrett was driving the victim's car when she saw the victim at the North End Market around 8:15 p.m. waiting on someone to pick her up.

Cynthia Smith testified that she and a friend, Donna Oliver, were driving on Watson Drive during the late evening hours of July 29, 2003, when she saw a black car on the side of the road. When their headlights shined on the black car, a woman exited the driver's side and a man exited the passenger's side. The woman ran toward their vehicle "hollering, help me." Smith and Oliver traveled up the road approximately two miles and called 911 from a store at 8:55 p.m. Smith recognized the victim, having known her in school. Smith did not get a close look at the man's face, but she noticed he was African-American and estimated that he weighed 155 to 160 pounds, was about six feet tall, had broad shoulders, and was wearing black and red hightop shoes. When shown a red, black, and white shoe for identification, Smith stated that she did not remember seeing white on the man's shoes that night.

On cross-examination, Smith admitted that she did not give a description of the man to the 911 operator or to Investigator McConnell during her July 30th statement. Smith explained, however, that she did not give a description to Investigator McConnell the first time because she was scared. Smith stated that she gave a second statement to police, during which she described the man's shoes and said he was wearing a hooded top draped over his face. She also said that the man appeared to have short hair but she could not say for sure. In response to questioning, Smith acknowledged that she could not tell for sure that the man was African-American because he was wearing long pants and long sleeves with his face covered, but she assumed "[i]f it would have been a white man standing there, [she] could have seen some kind of . . . white."

Donna Oliver testified that she was in the vehicle with Cynthia Smith on the night in question. Oliver was driving and Smith was the passenger. Oliver recalled the events of that night similarly to Smith. Oliver stated that the man was a young African-American man, approximately five feet, eight inches tall, weighing 155 pounds, with medium length dark hair.

911 operator, Jennifer Ragaglia, testified that she received two calls regarding an incident on Watson Drive the evening of July 29, 2003. The first

-4-

call was received at 8:55 p.m. and was from two women reporting that they had seen a car with two people in it, fighting. The second call was received at 8:59 p.m. and was from Martha Crosby reporting that a woman's throat had been cut. Ragaglia stated that another operator answered a call at 8:57 p.m. reporting that there was a female subject on Watson Drive with a gunshot wound or slashed throat.

Tammy Middleton testified that she saw a girl standing beside a car on Watson Drive the night of July 29, 2003, around 8:30 to 8:45 p.m. Middleton thought the girl had a flat tire so she stopped to help and noticed that the girl was covered in blood and had blood coming out of her nose. Middleton ran to a nearby house trailer, had the residents call 911, and returned to help the girl. The girl had money clinched in her hand.

Mary Johnson testified that she has known the [petitioner] for a long time. Johnson remembered hearing about the victim getting shot but had no first-hand knowledge of the incident. Johnson saw the [petitioner] a few days after the shooting riding his bicycle in town. When asked what was said when she stopped to talk to the [petitioner], Johnson replied,

> I asked him why did he kill the girl. I said, it's all over town that you did it. I heard you killed her. Why'd you do it? He said, f[ ]ck you. It's my sh[ ]t that come up missing. But he didn't kill her. That's what was said.

Johnson said that the [petitioner] told her then and two days later that he did not kill the victim. On cross-examination, Johnson said that she asked the [petitioner] the question in a teasing manner.

Thirteen-year-old Robert Oliver testified that the evening of July 29, 2003, he was on High Avenue playing with a friend, Fred Barnett, outside. Around 9:00 p.m., he saw someone run down Pine Bluff Road, turn onto High Avenue, stop under a street light and give him a mean look, then continue running. The individual was about seven feet away from him and he recognized the person as the [petitioner]. Oliver knew the [petitioner] fairly well prior to that night. He remembered hearing sirens all around at the same time he saw the [petitioner] running. The [petitioner] was wearing very baggy or loose bottoms. On cross-examination, Oliver admitted that he originally told Investigator McConnell that the person was wearing a white jersey with a number 36 on it and tan shorts.

Fourteen-year-old Fred Barnett testified similarly to Robert Oliver. In addition, Barnett heard gunshots before he saw a man running down Pine Bluff Road. Barnett did not know the man, but he described him as African-American with "puff things in his hair" and a little hair on his face. Barnett picked the [petitioner] out of a photographic array as the man he saw running that night and also pointed him out at trial.

Lawrence County Police Department Officer Parker Hardy testified that the [petitioner's] aunt, Calandra McWilliams, lived eight-tenths of a mile from where the victim was parked on Watson Drive. Officer Hardy ran from the crime scene to McWilliams' house via a route on High Avenue and it took him six minutes.

Calandra McWilliams, the [petitioner's] aunt, testified that on July 29, 2003, the [petitioner] was living with her at her house. McWilliams arrived home a little after 8:00 p.m. and the [petitioner] was on the porch. The [petitioner] came inside the house about five or ten minutes later and asked McWilliams to take him to get something to eat. She recalled that they got into the car to leave at 9:03 p.m. McWilliams acknowledged that in the statement she gave Investigator McConnell she said that the [petitioner] came inside her house at 9:00 p.m. wanting to get something to eat. McWilliams also acknowledged that she did not know where the [petitioner] was between 8:00 and 9:00 p.m.

McWilliams testified that after she and the [petitioner] got in the car at 9:03 p.m., she first took the [petitioner] to Amber Brant's house before getting something to eat. McWilliams let the [petitioner] out of the car at Brant's house while she turned around. She saw the [petitioner] walking toward the car followed by Brant, and the [petitioner] picked up a plate from her car and hit Brant on the head. The [petitioner] got back into the car, and they went by the North End Market, but it had already closed so they went home. On cross-examination, McWilliams said that the clock in her car was five to ten minutes fast. McWilliams also said that the [petitioner] was about six feet, three inches tall. McWilliams remembered hearing sirens nearby when they returned home.

Tennessee Bureau of Investigation Agent Elizabeth Reid testified that she examined the victim's car for fingerprints. Agent Reid found one of the [petitioner's] fingerprints on the outside back passenger door of the vehicle.

-6-

On cross-examination, Agent Reid stated that it was entirely possible for someone to be in a vehicle and not leave any identifiable latent fingerprints.

Investigator Samuel McConnell with the Lawrenceburg Police Department identified a bloody $10 bill found at the scene and the [petitioner's] red, black, and white shoes that he confiscated from the [petitioner]. Investigator McConnell recalled that the [petitioner] admitted to wearing those shoes the night the victim was murdered. Investigator McConnell timed the drive from the scene of the shooting to Brant's house as taking two minutes and five seconds. He also timed the drive from the scene of the shooting to the country store where Oliver and Smith phoned 911 as taking one minute and forty-seven seconds.

Investigator McConnell questioned the [petitioner] and the [petitioner] denied being with the victim on Watson Drive on July 29, 2003. Investigator McConnell later went to the [petitioner's] aunt's house to arrest the [petitioner] and he caught the [petitioner] trying to escape out of a window in the back of the house. Investigator McConnell then questioned the [petitioner] a second time during which he admitted being with the victim and Serrett at 8:00 p.m. He further stated that the victim and Serrett left together so he walked to Brant's house where he hit her with a plate and then went home. When asked, Investigator McConnell stated that he is six feet tall and said that the [petitioner] reported his height and weight as six feet, one inch and 170 pounds, respectively.

Dr. Bruce Levy performed an autopsy on the victim and determined the cause of death to be a single gunshot wound to the face. The state then rested its case-in-chief, and the [petitioner] put on the following proof.

Linda Brewer testified that she was in the area of Watson Drive the night in question and heard a gunshot. As she traveled on Watson Drive, she saw two cars on the side of the road and a girl standing with her head tilted over and covered in blood. Brewer called 911.

Gregory Cobbins, the [petitioner's] uncle, testified that around 8:15 to 8:30 p.m. the [petitioner] told him he was going to the store. About ten minutes later, Cobbins left the house to look for the [petitioner]. Cobbins went to the North End Market and saw the victim while he was there. From the market, Cobbins could see the [petitioner] at the nearby Richardson house talking with Amber Brant. Cobbins saw another individual leave the

-7-

Richardson house and walk toward the market. The [petitioner] then walked to the market and asked Cobbins for a ride home and Cobbins said no. The [petitioner] then began walking and Cobbins followed him in the car. The [petitioner] walked to an apartment building on May Street and went inside for three minutes, came back outside, jumped a ditch on the side of the road and went home. The [petitioner] and Cobbins both arrived home around 8:48 p.m.[3] Cobbins saw the [petitioner] leave with the [petitioner's] aunt, Calandra McWilliams, around 9:00 p.m. Cobbins acknowledged that the [petitioner] never mentioned to the police officers that Cobbins could provide him an alibi. Cobbins said that in August 2003, he was working on a road crew and Serrett drove by and made a gun gesture with his hand to his forehead.

James Bumpus testified that he gave a statement to Investigator McConnell on August 10, 2003, during which he told the investigator that he was on Watson Drive on July 29th which was a lie he had told to help Amber Brant. On cross-examination, Bumpus admitted that Brant did not want to tell the police what she knew for fear of getting arrested so she asked Bumpus to pretend he knew the information she told him first-hand.

James McWilliams testified that he lived on Perry Street next to the [petitioner's] uncle Gregory Cobbins. The afternoon of July 29, 2003, Serrett and the victim arrived at McWilliams['] house around 2:30 or 3:00 p.m. and Serrett gave McWilliams a beer. A short while later, McWilliams saw the [petitioner] leave with Serrett and the victim. McWilliams saw the [petitioner] again, ten or fifteen minutes later, walking back to the house. On cross-examination, McWilliams admitted that he told Investigator McConnell that he remembered seeing the [petitioner] walking back to the house and Cobbins driving behind him. McWilliams told Investigator McConnell that the [petitioner] and Cobbins had been home for over an hour before he heard sirens going down the road.

Wilbur Cobbins testified that he was at his niece's house on Perry Street the afternoon of July 29, 2003, and saw Serrett and the victim arrive around 4:45 p.m. and then leave with the [petitioner]. Wilbur Cobbins said that the [petitioner] returned to the house, walking, between 8:30 and 8:45 p.m followed by Gregory Cobbins. On cross-examination, Wilbur Cobbins admitted that he was back and forth from his house and his niece's house that evening. Wilbur Cobbins disputed that the [petitioner] and Gregory Cobbins

---

[3] Cobbins lived on the same street as Calandra McWilliams and the [petitioner].

had been home over an hour before he heard the sirens.

As a rebuttal witness, the state offered the testimony of Jamiha Keene who testified that on July 29, 2003, the [petitioner] stopped by his apartment at the May Street Apartment complex and tried to borrow his bicycle. Keene would not let the [petitioner] borrow his bicycle so the [petitioner] took off on "Kenny's" bicycle. Keene said it was sometime between 3:00 and 4:00 p.m. when the [petitioner] stopped by.

Jonathan McGee testified that he also lived in the May Street Apartment complex and on July 29, 2003, the [petitioner] stopped by the first time between 4:00 and 5:00 p.m. and asked to borrow his bicycle. When McGee said no, the [petitioner] jumped on someone else's bicycle and took off. McGee saw the [petitioner] again that night, this time about 11:00 or 11:15 p.m., after his daughter's usual bedtime. While McGee was outside his apartment, he saw the [petitioner] "pull the bike up, . . . run upstairs for just a few seconds, run back down, and was gone." On cross-examination, McGee maintained that he was sure these events happened on July 29th.

Id. at *1-6.

On April 15, 2008, the petitioner filed a petition for post-conviction relief, and counsel filed an amended petition on December 11, 2008. In his petitions, the petitioner argued, among other things, that trial counsel was ineffective for failing to seek suppression of or object to the introduction of his red, black, and white shoes that the police obtained following his August 1, 2003, interview with police. The court conducted an evidentiary hearing on February 26, 2009. At the post-conviction hearing, the petitioner's trial counsel testified that he was appointed to represent the petitioner in his first degree murder trial after the petitioner's previous attorney was employed by the district attorney's office.[4] The previous attorney had filed a motion to suppress the petitioner's post-arrest statement to police. The subject of the motion was an August 28, 2003, "custodial statement" made by the petitioner.

Counsel testified that he was also aware of a "short statement" given by the petitioner a few days after the July 29, 2003, murder, on August 1, 2003. Counsel had seen the statement and "there was nothing in [it] that had to do with the Sherry Pogue murder." Counsel recalled that toward the end of the statement, the petitioner was asked if he had a

---

[4] Some of the testimony at the hearing concerned a Batson v. Kentucky issue. However, that issue was not raised on appeal, so we will not include that testimony in our summary.

gun, and "[h]is answer was, no, he did not have a gun. There was nothing in the statement that really concerned [counsel] about the murder case."

Counsel recalled that "there was some discussion about the clothing [the petitioner] was wearing," but he did not know whether that came up in the petitioner's first statement. He noted that the petitioner's clothing was a material issue at trial and was "litigated heavily." Counsel stated that personnel from the sheriff's office obtained the petitioner's shoes, which were subsequently introduced at trial. Counsel testified that he did not remember the circumstances of the first interview, but he "remember[ed] that the taking of the shoes [was] of some concern, because they were a specific pair of shoes. They had colors that were involved."

Counsel testified that it was his understanding that Investigator Sammy McConnell conducted the interview and that it took place at the police station. He acknowledged that he did not seek to suppress anything out of that interview and did not object to the introduction of the shoes at trial or raise the issue on appeal.

Counsel testified that the theory of defense was alibi, "which is always kind of tricky, because it's sort of an all-or-nothing kind of defense." Counsel recalled that Cynthia Smith, one of the State's witnesses, placed the petitioner at or near the scene of the murder. However, Smith had given two relatively inconsistent statements, and counsel felt that "she ended up being a very favorable witness for the defense" and that he "seriously impeached . . . her testimony."

Counsel testified that Smith came to his office for an interview prior to trial, and he asked her about the perpetrator's shoes. He explained that he had already seen the petitioner's shoes and knew they were red, black, and white. However, Smith told him that "the shoes she saw didn't have white on them." Counsel said that he cross-examined "her intensely about the shoes," and he "actually thought the shoes were favorable to the defense[.]" Counsel recalled that Smith was the only witness who testified about the shoes. He stated that Donna Oliver, who was an occupant in the vehicle with Smith, corroborated some of Smith's testimony, "but a lot of her facts were impeached."

On cross-examination, counsel reiterated that he did not seek to suppress the petitioner's first statement because it had nothing to do with the murder. He explained that "[t]he only thing that even remotely . . . had an implication to that" was the petitioner's being questioned about possessing a gun, which the petitioner denied. Counsel said "that was never an issue at the trial."

-10-

With regard to the petitioner's shoes, counsel explained that after his interview with Smith, he surmised that her testimony was going to be helpful "because she was pretty much going to say that [the petitioner's shoes] didn't quite look like the shoes that she saw." He recalled that Smith indeed testified that the shoes she saw were red and black, so he felt that her testimony "essentially . . . removed [the shoes] from the equation."

Counsel testified that the issue with the petitioner's first statement was that the seizure of the petitioner's shoes "spawned out of that statement" and the shoes were an issue at trial. However, counsel thought that the issue "was pretty much defused." Counsel hypothesized that "[i]t was not the shoes that convicted [the petitioner]. . . . Th[e] case was ultimately decided on the testimony of two young boys." Counsel acknowledged that he "could have moved to try to suppress those shoes [but] felt that if [he] could get . . . the witness to say that the shoes that they actually introduced didn't look like the ones that she saw, [he] just saw that as . . . favorable." He said that the decision was a trial tactic because he thought the witness's testimony was helpful.

On redirect examination, counsel testified that he sought to suppress the petitioner's second statement to police, which the petitioner gave on August 28, 2003. He recalled that in the second statement, the petitioner made reference to the shoes that had been taken from him during the first interview. He noted that the petitioner was asked what he was wearing on the night of the murder, and the petitioner said "[he] was wearing the shoes that [the police] sent to the lab[.]"

The petitioner testified that he was in general sessions court on August 1, 2003, regarding a firearms possession charge that was unrelated to the murder case. He said that as he was leaving the courthouse, Investigator McConnell approached him and asked him to make a statement. He said that he walked with Investigator McConnell around the courthouse to the sheriff's office.

The petitioner testified that Investigator McConnell asked him to provide a statement "that would not be used in court" regarding what he had seen on the night of the murder. The petitioner said that he told Investigator McConnell that he "needed a lawyer present to make a statement, but [Investigator McConnell] assured [him] that the statement would not be used against [him] or against anyone else" and continued asking questions. He stated that Investigator McConnell advised him that he did not have to answer any questions but did not advise him that he had the right to an attorney.

The petitioner testified that Investigator McConnell asked him about the clothing, including footwear, he was wearing on the night of the murder. The petitioner stated that he told Investigator McConnell that he had been wearing the same shoes that he had on at

that time. He recalled that Investigator McConnell kept staring at his shoes, so he told Investigator McConnell that he was ready to leave. Investigator McConnell told him that he could leave at any time, so the petitioner "left the room [and] told [Investigator McConnell] I can't give you my shoes."

The petitioner testified that as he walked outside where his mother was, Investigator McConnell told him that "he would have a search warrant by 12:00 o'clock" if the petitioner did not give him the shoes, and the petitioner "told him to go get a search warrant." However, the petitioner's mother informed him "to hand over the shoes. He doesn't have a search warrant. You hand over the shoes. You in the clear. You'll be clear." The petitioner denied that he gave up his shoes because Investigator McConnell said that he could get a search warrant.

On March 4, 2009, the post-conviction court entered a written order denying post-conviction relief. The court found that the statements made by the petitioner on August 1, 2003, as well as his shoes, were properly admissible; therefore, counsel could not be faulted for not attempting to have that evidence suppressed.

## ANALYSIS

The petitioner argues that he received the ineffective assistance of counsel. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

The petitioner argues that counsel was ineffective for failing to seek suppression of "the fruits" of his August 1, 2003, encounter with Investigator McConnell. He asserts that Investigator McConnell continued to question him after he invoked his right to counsel; therefore, a motion to suppress his statement would have had merit. He also asserts that counsel should have sought suppression of his shoes as having been seized without a warrant. He claims that his "surrendering his shoes in response to repeated threats to obtain a warrant does not constitute valid consent to the seizure of his property."

Upon review, we conclude that the petitioner has failed to prove that he received ineffective assistance of counsel. We discern no deficiency in counsel's performance with regard to counsel not seeking suppression of the petitioner's statement or shoes. Counsel testified at the evidentiary hearing that he did not move to suppress the petitioner's statement because it contained nothing that had to do with the murder. Counsel noted that the seizure of the petitioner's shoes "spawned out of that statement," but counsel actually viewed the shoes as favorable evidence in that Cynthia Smith was going to testify that the petitioner's shoes "didn't quite look like the shoes" worn by the perpetrator. Counsel acknowledged that he could have sought suppression of the shoes but made the tactical decision not to because he viewed the shoes, in light of Smith's testimony, as helpful to the defense. This was a legitimate trial tactic based on counsel's strategy to impeach Smith based on her inaccurate description of the shoes and inconsistencies in her prior statements with other testimony.

Moreover, the post-conviction court found that the statement was given during a non-custodial interview and properly admissible; therefore, counsel could not be faulted for failing to seek its suppression. "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). "Encompassed within [the protection against self-incrimination] is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation. When a suspect invokes that right to counsel, police must cease questioning until counsel is present." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (citations and footnote omitted). A person is "in custody" within the meaning of Miranda if there has been "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotations omitted).

The evidence shows that the petitioner voluntarily accompanied Investigator McConnell to the police station and was informed that he could leave anytime and that he did not have to answer any questions. The evidence further shows that the petitioner indeed terminated the interview at one point and left the police station. The petitioner was not arrested until almost four weeks later. Thus, the evidence does not preponderate against the post-conviction court's finding.

The petitioner also suggests that a motion to suppress his shoes would have been successful because his shoes were seized only after Investigator McConnell's repeated threats to obtain a warrant. In this regard, the post-conviction court found that the petitioner voluntarily surrendered his shoes. When asked at the evidentiary hearing whether he gave up his shoes because Investigator McConnell said he could get a search warrant, the petitioner stated, "No. That was not -- no. No." Instead, the petitioner indicated at the

hearing that he gave Investigator McConnell his shoes because his mother told him to. Therefore, the petitioner has failed to show that any deficiency in not seeking suppression of the shoes caused him prejudice because the evidence suggests that the motion would not have been granted as the police obtained the shoes with the petitioner's consent.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the petitioner has not met his burden of showing that trial counsel was ineffective in his representation. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE